# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Thomas W. Wales,

                    Plaintiff,

v.

Tran Trung, individually and in his
professional capacity; Dr. Shelly
Stanton, individually and in her
professional capacity; Dr. M. Anderson,
individually and in their professional
capacity; Jack Bakker, individually and
in his professional capacity; The
F.B.O.P.; Dr. Michael Nelson,
individually and in his professional
capacity; Dr. Serrano, individually and
in his professional capacity; Jim
Sullivan, P.A., individually and in his
professional capacity; Warden Terrell,
individually and in his professional
capacity; Steve O'Conner, C.M.C.,
individually and in his professional
capacity; Dan Cansino, individually and
in his professional capacity; Jeff
Schmidt, individually and in his
professional capacity; Lt. Nagel,
individually and in his professional
capacity; Christenson, C.O.,
individually and in his professional
capacity; The Medical Idle Committee;
The Utilization Review Committee; and
Future Doe Defendants;

                    Defendants.

Civ. No. 08-39 (JNE/JJK)

**REPORT AND
RECOMMENDATION**

Thomas W. Wales, 1908 East 19th Lot W 30, Lawrence, KS 66046, *pro se*.

Lonnie F. Bryan, Esq., Assistant United States Attorney, for Defendants.

JEFFREY J. KEYES, United States Magistrate Judge

**INTRODUCTION**

This matter is before this Court on Defendants' Motion to Dismiss or for

Summary Judgment (Doc. No. 130). The case has been referred to this Court for

Report and Recommendation pursuant to 28 U.S.C. § 636 and D. Minn. Loc.

R. 72.1. For the reasons stated below, this Court recommends that Defendants'

motion be granted and this action be dismissed with prejudice.

**BACKGROUND**

**I.    Procedural Background**

On December 3, 2004, United States District Judge Richard Rogers,

United States District Court, District of Kansas, imposed a concurrent 16-month

prison sentence on Plaintiff, after Plaintiff pleaded guilty for committing two

federal crimes: (1) possession with intent to distribute 100 or more marijuana

plants; and (2) possession of an unregistered firearm. From January 3, 2005, to

April 14, 2009, Plaintiff was confined at the Federal Medical Center, in

Rochester, Minnesota ("FMCR"). From there, he was transferred to a residential-

reentry center in Leavenworth, Kansas, to complete his term of imprisonment.

Plaintiff's projected release date was July 9, 2009.

On January 8, 2008, Plaintiff filed a Complaint in the United States District

Court, District of Minnesota (Doc. No. 1), and on February 13, 2008, the Court

granted Plaintiff's application for leave to proceed in forma pauperis. (Doc.

No. 5.) On October 15, 2009, this Court granted in part Plaintiff's Motion to File a

First Amended Complaint (Doc. No. 83), and on February 12, 2009, the District Court granted Plaintiff's request for a 45-day extension to file his First Amended Complaint. (Doc. No. 102.) Plaintiff filed his Second Amended Complaint on March 3, 2009. (Doc. No. 104.)

This case is based on Plaintiff's claim that he received grossly inadequate medical care during his four-plus years of confinement at the FMCR. Plaintiff, who is *pro se*, alleges various constitutional, federal statutory, and common law claims in his Second Amended Complaint, including allegations that: (1) Defendants denied him reasonable medical care by not prescribing appropriate levels of narcotic pain medication to treat various ailments and illnesses; (2) Defendants failed to provide him with adequate medical care for various medical conditions including Hepatitis-C-blood disease, bone spurs in his feet, and a hernia; (3) Defendants conspired to discriminate and retaliate against him for accessing the courts and filing grievances against the FBOP and did retaliate against him by denying him the benefits of the Second Chance Act and home confinement; (4) Defendants conspired with the Mayo Clinic to perform experimental, unnecessary surgeries on inmates, including Plaintiff, and Plaintiff was infected with Hepatitis-C-blood disease when tainted blood was used during an unnecessary gall bladder surgery performed on him; (5) when Plaintiff had less than twelve months left to serve on his sentence, Defendants denied Plaintiff life-saving Hepatitis-C-interferon treatment and corrective surgery in order to avoid the expense of such medical treatment; (6) Defendants let Plaintiff's

Hepatitis C go untreated in order to inflict him with emotional pain in retaliation for his filing a lawsuit and seeking administrative remedies; (7) Defendants retaliated against Plaintiff by refusing to provide essential medical records that would have allowed Plaintiff to qualify for social-security-disability benefits; and (8) Defendants destroyed Plaintiff's legal mail, including a November 4, 2009 Order from this Court dismissing Mayo Clinic and Mayo Defendants from this lawsuit, in order to prevent Plaintiff from settling with the Mayo Clinic and its doctors. (Doc. No. 104, Second Am. Compl.)

On August 26, 2009, Defendants filed a motion to dismiss the Second Amended Complaint or for summary judgment. (Doc. No. 130.) In support of their motion, Defendants submitted comprehensive declarations describing in detail the medical treatment received by Plaintiff at the FMCR, which also provide specific references to approximately 1,000 pages of medical records that purportedly support their position that adequate, indeed extraordinary, medical care was provided to Plaintiff at the FMCR. Defendants also submitted similar detailed documentation supporting their denial that any retaliatory treatment against Plaintiff took place as alleged in any of Plaintiff's claims in the Second Amended Complaint.

Plaintiff has submitted no response to Defendants' dispositive motion. This Court could treat Plaintiff's failure to respond as a default, and Defendants' motion could be granted on that ground alone. (*See* Doc. No. 133, Pretrial Scheduling Order 3 ("All dispositive motions will be considered on the written

pleadings without oral argument, unless the Court determines there is a specific need to hold such a hearing. If any party fails to respond to a motion, the failure to respond will be treated as a default, and the relief requested in the motion may be granted."); *see also* Fed. R. Civ. P. 56(e)(2) ("When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.").

Nevertheless, this Court has carefully reviewed, on the merits, all of the evidence proffered by Defendants in order to confirm that they have sustained their burden of showing that dismissal is required. This Court has done so, however, cognizant of the fact that Plaintiff, the party opposing a fully supported motion for summary judgment, cannot simply rely upon an unsubstantiated pleading to create triable issues and avoid summary judgment, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Krenik v. County of Le Seur*, 47 F.3d 953, 957 (8th Cir. 1995).

## II.     Factual Background[1]

### A.     Reduction or Withdrawal of Narcotics

When Plaintiff arrived at the FMCR in January 2005, he suffered from numerous, severe physical ailments.  He weighed 335 pounds, had a body mass index of 44, and had medical conditions that included asthma, hypertension, obstructive sleep apnea, degenerative joint disease, low back and leg pain, gout, and chronic pain syndrome.  He was receiving extremely high doses of narcotics, including 400 mg of extended release morphine and 320 mg of oxycontin (aka oxycodeine), and had a history of substance abuse.  When Plaintiff arrived at the FMCR he claimed he needed prescriptions for 1600 mg of morphine and 640 mg of oxycontin daily.  At that time Dr. Trung Tran, Plaintiff's primary care doctor at the FMCR, developed a plan to treat Plaintiff's pain with lower doses of narcotics. Dr. Tran did this after consulting with the pain clinic in Lawrence, Kansas, where Plaintiff had been treated before coming to the FMCR, and after being told by Plaintiff's treating physician in Kansas that there was no medical reason for Plaintiff to continue on such a high dose of narcotic medication.  A four-year struggle then ensued as Plaintiff fought against the efforts to wean him from his

---

[1]     This fact summary about Plaintiff's medical care at the FMCR is drawn from the extensive declarations of the FMCR physicians, medical personnel, and administrators submitted in support of Defendants' motion, including Dr. Trung Tran, Dr. Shelley Stanton, James Sullivan, D.O., Michael Nelson, Dennis Blitz, Warden Duke Terrell, Steve O'Connor, Dan Cansino, Jeff Schmidt, Jack Bakker, Devin Nagle, and Matthew Christianson.  As noted above, Plaintiff submitted no response to this evidence.

narcotic addiction and while physicians treated him for numerous medical problems.

Throughout Plaintiff's confinement at the FMCR, Plaintiff suffered from various ailments, injuries, and complaints of pain, and the various FMCR doctors treating him adjusted his narcotic regimen in an attempt to manage pain and provide relief while trying to curb Plaintiff's overall dependence on the narcotics. These efforts were complicated by the fact that over his four-plus years at the FMCR, Plaintiff's problems included, by way of example, all of the following: (1) suicidal gestures in January 2005 (razor-cutting of wrists and fashioning a noose from a medical device); (2) hospitalization at Mayo Clinic in February 2005, for hypertension; (3) assaulting another inmate in March 2005; (4) torn rotator cuff surgery in March 2006; (5) gall bladder surgery in June 2006; (6) right rotator cuff repair in June 2007; (7) hiatal hernia in 2007; (8) various evaluations for cardiac conditions by Mayo Clinic specialists, including echocardiograms in January 2005, and February 2007, as well as cardiac tests in October 2008; (9) nerve conduction study in September 2006, and carpal-tunnel-syndrome treatment by Mayo Clinic specialists in 2006-2007; (10) treatment for potential Hepatitis C in 2007-2008, including liver biopsy by Mayo Clinic; (11) bone spurs in feet in May 2008; (12) rectal bleeding and stomach pain in January 2007, resulting in colonoscopy, biopsy, and evaluation by Mayo Clinic specialists; and (13) ongoing physical therapy for mobility problems arising from morbid obesity, including provision of various medical devices such as a walker, cane, special

shoes, ankle and knee braces, hand splints and compression garments.

The detailed declarations submitted by Defendant physicians and the FMCR medical staff establish that there was ongoing, genuine concern about the potentially fatal effect of the high doses of narcotics Plaintiff received prior to his federal imprisonment. For example, Dr. Tran expresses in his Declaration his concern that:

> [A] continuation of treatment involving high doses of narcotics [Plaintiff] received prior to his federal imprisonment might also have a substantial suppressive effect on his respiratory system. This concern was specifically based on the fact that he complained of obstructive sleep apnea for which he also required treatment prior to his federal imprisonment. The combination of treatments for respiratory problems and relief of pain created the potential for a respiratory cessation and potential sudden death to occur if high doses of narcotics were also prescribed for the Plaintiff.

(Doc. No. 130, Attach. 2, Decl. of Trung M. Tran, M.D. ("Tran Decl.") ¶ 16.) Plaintiff has set forth no evidence showing that Defendants took him off pain medication, or lowered his dosage, as a means to inflict pain on Plaintiff in retaliation for Plaintiff's ongoing complaints about his medical care.

### B. Gall Bladder Surgery

In 2006, Plaintiff complained to his FMCR physician that he suffered from abdominal pain. An ultrasound test was performed at the Mayo Clinic on June 27, 2006, and a Mayo Clinic specialist recommended gall-bladder-removal surgery because the ultrasound revealed evidence of cholelithiasis. The gall bladder surgery was performed at Mayo Clinic on September 14, 2006. The FMCR physicians played no role in the gall bladder surgery, which was

performed by Mayo Clinic surgical physicians and staff.

Plaintiff alleges that the Mayo physicians incorrectly diagnosed a previously existing hernia condition as a gall bladder condition and then performed unnecessary surgery. He contends that there is a conspiracy between the FMCR and Mayo Clinic to send federal inmates to Mayo Clinic for unnecessary surgery so that Mayo doctors can gain experience. He also contends that he was infected with contaminated blood during the gall bladder surgery or during his after-surgery care at the FMCR, and that he contracted a Hepatitis-C infection.[2]

The FMRC Defendants have provided sworn declarations stating that there was no arrangement with the Mayo Clinic to deprive Plaintiff, or any other prisoner, of adequate medical care or to allow experimental surgery to be conducted on Plaintiff's body. The FMCR Defendants declare that they relied on the opinion of the Mayo Clinic specialist who recommended the gall-bladder-removal surgery and assert that there is no evidence that "tainted blood" was

---

[2]     The District Court previously granted the Mayo Clinic and Mayo physician Defendants' motion to dismiss because Plaintiff failed to state a claim against the Mayo Defendants upon which relief could be granted. Construing Plaintiff's claims against the Mayo Defendants as common law claims for breach of the professional duty that Mayo Defendants owed to Plaintiff in connection with Plaintiff's medical treatment, the Court concluded that the claims must be dismissed because Plaintiff did not file any expert affidavit attesting to a medical expert's opinion that Mayo deviated from the applicable standard of care and caused injury to Plaintiff. Plaintiff also originally alleged that the Mayo Defendants had violated Plaintiff's constitutional rights by deliberately denying him access to medical care and violated the Tucker Act, 28 U.S.C. § 1491, by infusing him with tainted blood. The Court dismissed these claims because such claims cannot be brought against private contractors like Mayo.

transfused into Plaintiff's body or that the FMCR staff infected Plaintiff with Hepatitis. Plaintiff has not set forth any evidence to support his contention that there was a conspiracy between the Mayo Clinic and the FMRC to perform unnecessary, experimental surgery, that unnecessary gall bladder surgery was performed, that Plaintiff was transfused with "tainted blood" that caused Hepatitis C, or that he was provided with inadequate post-surgery care by the FMCR.

### C. Hepatitis-C Treatment

Throughout 2007, physicians performed various tests to determine the nature of the problems associated with Plaintiff's liver. In January 2008, a Mayo Clinic specialist performed a liver biopsy, which revealed evidence of chronic Hepatitis. Basic treatment for chronic Hepatitis C involves "combination therapy" with interferon and ribavirin, but this therapy may cause serious side effects, including the risk of death due to heart attack, mood or behavioral problems that include irritability, depression, and anxiety, sudden and severe worsening of liver disease, infection and autoimmune problems, extreme fatigue and flue-like symptoms, upset stomach, blood sugar problems, sleeping problems, and organ problems.

The physicians at the FMCR were concerned that Plaintiff was not a suitable candidate to endure the rigors of combination-therapy treatment. The Chief Physician for the Bureau of Prisons ("BOP") gave preliminary approval for Plaintiff's treatment with combination therapy in July 2008, but Plaintiff developed chest pains and had difficulty breathing at that time, and it was determined that a

cardiac workup had to be done because the presence of cardiac disease is a significant contraindication to combination therapy. A Mayo cardiac specialist assessed Plaintiff's heart condition in October 2008, but the actual cause of Plaintiff's complaints about chest pain and difficulty breathing could not be determined. Dr. Michael Nelson, Regional Medical Director for the North Central Region of the BOP, reached the following conclusion:

> Due to the fact that the plaintiff was scheduled to be released from confinement in less than 48 weeks from the time Dr. McGoon [the Mayo cardiac specialist] issued his report, it was my professional judgment that treatment with combination therapy would not be pursued for the plaintiff. This conclusion was based on my professional judgment that the plaintiff's physical and mental condition could not be safely monitored by FMC employees for a full course of treatment. Further, based on the plaintiff's psychological evaluation and past history of noncompliance with medical recommendations, I had significant concerns that he would not follow through with appropriate medication monitoring if released from prison in the middle of treatment. My decision not to provide the plaintiff with combination therapy was not based on a conspiracy with others to violate the plaintiff's rights or retaliation for filing this lawsuit. It was based solely on the exercise of my best professional judgment.

(Doc. No. 130, Attach. 8, Decl. of Michael Nelson, D.O. ("Nelson Decl.") ¶ 10.) Plaintiff has set forth no evidence showing that Dr. Nelson was not exercising independent medical judgment in his decision or that he was deliberately disregarding Plaintiff's serious medical needs.

### D. Other Medical Treatments

The extensive declarations and records submitted by the FMCR Defendants also establish that Plaintiff received a wide range of therapies at the FMCR, including respiratory and physical therapy and treatment, which included

compression-leg stockings to treat varicose-vein problems, wrist splints to treat
carpal tunnel syndrome, a rolling walker to assist with walking, and extra-depth
diabetic shoes. Plaintiff complains that he was denied the use of a walker. The
record shows that he was issued a walker on November 20, 2007, was
subsequently authorized to use a cane on March 18, 2008, was provided with
crutches and an ankle brace after he fell on February 2, 2009, and was again
provided with a walker on February 27, 2009. When Plaintiff was transferred out
of the FMCR to a residential-reentry center in 2009, he was authorized to take
with him a rolling walker, a cane, an ankle brace, two knee braces, hand splints,
and special medical shoes. Plaintiff has submitted no evidence to support his
contention that the FMCR Defendants denied him the use of a walker or any
other device in retaliation for Plaintiff's complaints about medical treatment at the
FMCR or in order to inflict pain or punishment on him.

　　　Plaintiff also complains that a device called an "abdominal binder" was
withheld from him in retaliation for his complaints or as a punishment. In March
2008, Physician's Assistant James Sullivan requested an abdominal binder for
Plaintiff, but the members of the FMCR's Medical Idel Committee denied the
request and instead recommended that Plaintiff should report to sick call for
individual evaluations of his condition. Thereafter, the FMCR provided Plaintiff
with a groin supporter, but because of his continued weight-gain, he again
requested access to an abdominal binder. Plaintiff was approved to use an
abdominal binder on January 13, 2009. Plaintiff has provided no evidence to

support his contention that the abdominal binder was withheld from him in 2008, in retaliation for his complaints or to inflict punishment on him.

### E.    Residential Reentry

The BOP confined Plaintiff at the FMCR from January 3, 2005, to April 14, 2009.  Thereafter, he was transferred to the Grossman Center, a residential-reentry center in Leavenworth, Kansas, to complete his term of imprisonment. Plaintiff's projected release date for completion of his sentence was July 9, 2009.

Plaintiff complains that the FMCR violated the Second Chance Act by failing to initiate a residential-reentry-center placement for one year and home detention for six months at the end of Plaintiff's 60-month term of imprisonment. He contends that the failure to provide him with the earlier reentry-center and home-confinement alternatives was in retaliation for his complaints about the lack of adequate medical treatment.  These claims were investigated by the FMCR and were denied by Warden Terrell on August 18, 2008, "because the recommendation for 60-90 days of RRC placement was appropriate and the plaintiff received individual consideration of the relevant factors concerning RRC placement as outlined in 18 U.S.C Section 3621(b)."  (Doc. No. 130, Attach. 15, Decl. of Warden Duke Terrell ("Terrell Decl.") ¶ 12.)  Plaintiff appealed this decision to the Regional Director and to the General Counsel for the Bureau of Prisons, but his appeals were denied because "the RRC decision was consistent with the provisions of the Second Chance Act, relevant factors were considered when making the decision and the plaintiff never provided sufficient evidence to

prove retaliation." (*Id.*)

Plaintiff has set forth no evidence showing that RRC placement was delayed or withheld in retaliation for Plaintiff's complaints about medical treatment. Nor has he shown that there was any other retaliation, such as withholding his legal mail or social-security-disability records, for his accessing the courts.

## DISCUSSION

## I.    Standard of Review

Summary judgment is proper if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The Court must view the evidence, and the inferences that may be reasonably drawn from the evidence, in the light most favorable to the nonmoving party. *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996). However, as the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enter. Bank*, 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Krenik*, 47 F.3d at

957. A party opposing a properly supported motion for summary judgment "may not rest upon mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

## II. Analysis – Summary Judgment Should be Granted Dismissing All Claims

### A. Constitutional Claims

The primary thrust of Plaintiff's Second Amended Complaint is that the FMCR Defendants violated his constitutional rights by intentionally denying or delaying access to necessary medical care, or by being deliberately indifferent in responding to Plaintiff's medical needs. Plaintiff's claims are governed by *Bivens*, which provides a cause of action for constitutional violations by federal officers. *Bivens v. Sixth Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

It is well-established that deliberate indifference to a prisoner's serious medical needs is prohibited by the Eighth Amendment. *See Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976) (concluding that "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain . . . proscribed by the Eighth Amendment") (citation and quotations omitted); *Alberson v. Norris*, 458 F.3d 762, 765 (8th Cir. 2005) (same). "A prisoner's Eighth Amendment rights are violated if prison officials show 'deliberate indifference' to the prisoner's 'serious medical needs.'" *Olson v. Bloomberg*, 339 F.3d 730, 735 (8th Cir. 2003) (quoting *Estelle*, 429 U.S. at 106). To prevail on a

claim of constitutionally inadequate medical care, an inmate must "demonstrate (1) that [he] suffered objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs." *E.g., Plemmons v. Roberts*, 439 F.3d 818, 823 (8th Cir. 2006) (quoting *Dulaney v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997)). "As long as this threshold is not crossed, inmates have no constitutional right to receive a particular or requested course of treatment, and prison doctors remain free to exercise their independent medical judgment." *Dulaney*, 132 F.3d at 1239.

"Deliberate indifference may be manifested by prison doctors in responding to the prisoner's needs or by prison officials in intentionally denying or delaying access to medical care or intentionally interfering with prescribed treatment." *Meloy v. Bachmeier*, 302 F.3d 845, 849 (8th Cir. 2002). However, "[t]he prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation." *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000) (quotation omitted); *see also Smith v. Clarke*, 458 F.3d 720, 724 (8th Cir. 2006) ("Malpractice alone is not actionable under the [E]ighth [A]mendment."); *Long v. Nix*, 86 F.3d 761, 765 (8th Cir. 1996) (stating that prisoners "do not have a constitutional right to any particular type of treatment[,]" and "nothing in the Eighth Amendment prevents prison doctors from exercising their independent medical judgment"). "The [E]ighth [A]mendment does not transform medical malpractice into a constitutional claim." *DeGidio v. Pung*, 920

F.2d 525, 532 (8th Cir. 1990).

Plaintiff has come forward with no evidence to rebut the showing made by the FMRC Defendants that none of the Defendants were deliberately indifferent to Plaintiff's medical needs, or intentionally denied or delayed access to his medical care, or intentionally interfered with prescribed treatment. The detailed declarations submitted by Defendants, and the medical records supporting them, establish that Plaintiff, in fact, was provided with an extraordinary array of medical services and treatment throughout his four-plus years of confinement at the FMCR. This Court concludes that Plaintiff's disagreement with Defendants over treatment decisions, such as his contention that he should have been given more narcotic drugs, that he should not have had gall bladder surgery, or that he should have been provided combination-therapy treatment for his Hepatitis C, is not enough to establish deliberate disregard of serious medical needs in violation of the Eighth Amendment. *See Phillips v. Jasper County Jail*, 437 F.3d 791, 795 (8th Cir. 2006) (finding that the disagreement did not establish deliberate indifference); *Jolly*, 205 F.3d at 1096. Therefore, Plaintiff's claim that Defendants' treatment for his medical-health needs violates the Eighth Amendment fails and summary judgment should be granted on those claims.

Defendants also assert that they are entitled to qualified immunity as to Plaintiff's constitutional claims. This Court agrees. Therefore, even if Defendants' treatment of Plaintiff did violate the Constitution, this Court concludes that Defendants are entitled to qualified immunity.

"Qualified immunity extends to Bivens actions . . . and, if applicable, immunizes executive officials from a lawsuit[.]" *Patel v. U.S. Bureau of Prisons*, 515 F.3d 807, 812 (8th Cir. 2008) (citations omitted). Qualified immunity is a defense available to government officials who can prove that their conduct did "not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). A court must determine whether the defendant violated a constitutional right and whether that right was clearly established. *Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009). "Qualified immunity is available 'to all but the plainly incompetent or those who knowingly violate the law.'" *Avalos v. City of Glenwood*, 382 F.3d 792, 798 (8th Cir. 2004) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). Therefore, liability does not arise from an official's bad guess in a gray area, but instead flows only from the transgression of a bright line. *Davis v. Hall*, 375 F.3d 703, 712 (8th Cir. 2004). Thus, "[t]he doctrine gives ample room for mistaken judgments but does not protect the plainly incompetent or those who knowingly violate the law." *Bagby v. Brondhaver*, 98 F.3d 1096, 1098 (8th Cir. 1996) (quotations omitted); *see also Saucier v. Katz*, 533 U.S. 194, 205 (2001) (stating that "[i]f the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense"). "This accommodation for reasonable error exists because officials should not err always on the side of caution because they fear being sued." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quotations omitted).

Here, those Defendants that Plaintiff asserts violated his Eighth Amendment rights are entitled to qualified immunity because the unlawfulness of the treatment given (for example, the unlawfulness of switching or altering the dosage on Plaintiff's pain medications), was not apparent. *See Logan v. Clarke*, 119 F.3d 647, 649-50 (8th Cir. 1997) (finding that the efforts of the prison doctors, including their efforts in offering plaintiff other types of pain killers, did not reflect deliberate indifference to plaintiff's medical needs). Therefore, Defendants' motion for summary judgment should be granted as to Plaintiff's Eighth Amendment claims.

### B.   Federal Statutory Claim

Plaintiff alleges that Defendants violated the "Federal Laws that Protect Disabled persons in Prison" by depriving Plaintiff of reasonable medical care and treatment for Plaintiff's medical disabilities. (Doc. No. 104, Second Am. Compl. at 17.) The only federal statute he specifies is "42 U.S.C. 12132," which is a section in Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 *et seq.* The ADA protects qualified individuals with disabilities from being excluded from participation in or the benefits of the services, programs, or activities of a public entity, but it does not apply to an inmate confined in a federal prison. *See* 42 U.S.C. § 12132 (providing that Title II of the ADA does not apply to prisons operated by the federal government); *United States v. Wishart*, 146 Fed. Appx. 171, 173 (9th Cir. 2005) ("By definition, the ADA does not apply to the federal government."); *County of St. Louis v. Thomas*, 967 F. Supp. 370, 376

(D. Minn. 1997) ("[T]he ADA does not provide a cause of action against the federal government.").

Defendants, however, construing Plaintiff's Second Amended Complaint liberally, have interpreted Plaintiff's claim as one brought under the Rehabilitation Act of 1973, 29 U.S.C. § 794, which provides that no otherwise qualified individual with a disability shall be "excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). To state a prima facie claim under the Rehabilitation Act, a plaintiff must show: (1) he is a person with a disability as defined by the statute; (2) he is otherwise qualified for the benefit in question; (3) he was excluded from the benefit due to discrimination based upon the disability; and (4) the program or activity from which he is excluded receives federal financial assistance. *Randolph v. Rodgers*, 170 F.3d 850, 858 (8th Cir. 1999) (citing *Gorman v. Bartch*, 152 F.3d 907, 912 (8th Cir. 1998)).

Plaintiff has set forth no facts showing that his claim should survive summary judgment. First, Plaintiff has not come forward with any evidence to rebut Defendants' showing that he is not a qualified individual with a disability as defined by the statute. The only evidence in the record provided by Plaintiff about his alleged disability is a letter from the University of Kansas, which was attached to Plaintiff's Second Amended Complaint. This letter, however, does not diagnose Plaintiff as disabled; rather, it states that Plaintiff "has reached [his]

maximum improvement in pain and limitations." (Second Am. Compl., Attach. 1, at 1.)  The evidence submitted by Defendants, unrebutted by Plaintiff, is that Plaintiff was working full time operating his own drilling company when he began his sentence at the FMCR.  Because Plaintiff has provided nothing further, he has not shown that he is qualified for the Rehabilitation Act, or that there is a genuine issue for trial as to his claim.

Second, Plaintiff has come forward with no evidence showing that he was excluded from any medical treatment, or other tangible benefit at the FMCR, due to discrimination based on a disability.  Moreover, Plaintiff has presented no evidence, or even alleged that a similarly situated non-disabled person was treated better than he.  Indeed, Plaintiff's complaint appears to be that all prisoners, as a matter of BOP policy, are denied narcotic medication or otherwise provided with inadequate medical treatment.  Defendants, on the other hand, have provided a detailed explanation, and presented evidence, in support of their motion for summary judgment showing that there were legitimate, non-discriminatory reasons for all of Plaintiff's treatment, as described in the factual background section above.  Therefore, because Plaintiff has not set forth specific facts showing a genuine issue for trial as to his statutory claim, this Court recommends granting Defendants' motion as to this claim.

### C.    Common Law Claims

Several of Plaintiff's claims alleging lack of or inadequate medical care may be characterized as common law claims for breach of the professional duty

that the FMCR Defendants owed to Plaintiff in connection with Plaintiff's medical treatment.  These include Plaintiff's claims that unnecessary gall bladder surgery was performed on him and that he was infected with Hepatitis C either during the surgery or when the "FBOP" used "dirty needles" and "contaminated equipment" during his aftercare.  (Second Am. Compl. ¶ 102-03.)

As described above, the FMCR Defendants have presented detailed declarations attesting to the fact that surgery was not performed on Plaintiff unnecessarily and asserting that there is no proof that Plaintiff's Hepatitis C was caused by the gall bladder surgery or his aftercare treatment.  Plaintiff, on the other hand, has come forward with no evidence to show there is a genuine issue for trial so that he could avoid dismissal of these claims.

Moreover, any such common law claim for breach of professional duty must be dismissed if Plaintiff has not filed an expert affidavit attesting to a medical expert's opinion that Defendants "deviated from the applicable standard of care and by that action caused injury to plaintiff[.]"  Minn. Stat. § 145.682, subd. 3.  There is no exception to the requirement for expert-opinion affidavits in actions commenced by *pro se* plaintiffs.  *See, e.g.,* Minn. Stat. § 145.682, subd. 5 ("If the plaintiff is acting *pro se*, the plaintiff shall sign the affidavit . . . referred to in this section and is bound by those provisions as if represented by an attorney.").  The failure to supply such an expert-review affidavit must result in dismissal of the complaint.  Minn. Stat. § 145.682, subd. 6; *Plutshack v. Univ. of Minn. Hosps.*, 316 N.W.2d 1, 5 (Minn. 1982) (stating that claims for "negligent

care and treatment" require expert testimony); *Tineo v. Fed. Bureau of Prisons*, No. Civ. 05-724 (ADM/SRN), 2005 WL 1745451, at *3 (D. Minn. July 22, 2005) (dismissing prisoner's medical-malpractice claims for failure to submit an expert-review affidavit); *Semler v. Finch*, No. A06-1178, 2007 WL 1976751, at *3 (Minn. Ct. App. July 10, 2007) (same).

"What matters in analyzing whether an expert affidavit is required is not how the plaintiff styles his or her claim, but whether the claim is, in essence, one for medical malpractice that requires expert testimony to establish a prima facie case." *Doe v. Tsai*, Civil No. 08-1198 (DWF/AJB), 2008 WL 4949156, at *2 (D. Minn. Nov. 17, 2008) (citing *D.A.B. v. Brown*, 570 N.W.2d 168, 171 (Minn. Ct. App. 1997) (holding that an allegation that a doctor breached his fiduciary duty by prescribing a drug while he was a participant in a kickback scheme related to that drug sounded in medical malpractice because the allegation "presented a classic informed consent issue"), and *Paulos v. Johnson*, 502 N.W.2d 397, 400 (Minn. Ct. App. 1993) (concluding that a negligent nondisclosure claim was considered malpractice)). Here, Plaintiff's common law claims flow from the medial treatment and care of Plaintiff by the FMCR Defendants and thus comes within the scope of Minn. Stat. § 145.682. Therefore, because Plaintiff has not filed any expert-review affidavits, these claims must be dismissed.

### D. Retaliation Claims

Plaintiff contends that Defendants conspired to retaliate against him for complaining about inadequate medical care, and that they retaliated by denying

him the benefit of the Second Chance Act of 2007, Pub. L. 110-199, 122 Stat.

657 (2008) ("SCA").  Specifically, Plaintiff contends that at the end of his prison

sentence he should have been given a one-year residential-reentry placement

and six-months home confinement.  Based on the recommendations of the

FMCR staff, however, Plaintiff was given only approximately sixty days of

residential-reentry placement.

The SCA does not require any particular period of confinement in a

residential-reentry center or in home confinement.  18 U.S.C. § 3624 provides

that:

> The Director of the Bureau of Prisons shall, to the extent practicable,
> ensure that a prisoner serving a term of imprisonment spends a
> portion of the final months of that term (*not to exceed 12 months*),
> under conditions that will afford that prisoner a reasonable
> opportunity to adjust to and prepare for the reentry of that prisoner
> into the community.  Such conditions may include a community
> correctional facility.

18 U.S.C. § 3624(c)(1) (emphasis added).  The plain meaning of this statute is

that the period of confinement in a community-correctional facility must not

exceed twelve months, not that it must be twelve months.  The BOP has

discretion, within the statutory guidelines, to choose a period of time less than

twelve months, or indeed no period of time at all, for a prisoner's reentry-

adjustment phase.  And the BOP also has discretion to choose the appropriate

"conditions" that will afford a reasonable opportunity for the adjustment and

reentry of the prisoner into the community; this "may" include a community-

correctional facility (i.e., halfway house), but release to the custody of such a

facility is not mandated.

This conclusion is buttressed by the provision in the SCA related to home confinement.  The SCA gives the BOP the discretion to place a prisoner in home confinement during the reentry-adjustment phase.  The SCA restricts this period even further:

> The [home-confinement] authority under this subsection *may* be used to place a prisoner in home confinement for the shorter of 10 percent of the term of imprisonment of that prisoner or 6 months.

18 U.S.C. § 3624(c)(2) (emphasis added).  The use of the permissive term "may" gives the BOP discretion to decide whether home confinement for a period of, at most, six months would be the practicable way to afford the prisoner a reasonable opportunity to adjust to and prepare for reentry in the community.  It does not, however, entitle a prisoner to placement in home confinement for any period of time.

The BOP's discretion in selecting the best way in which to afford the prisoner the adjustment and reentry opportunity is further illustrated by the fact that the SCA's prerelease-custody provision states that:  "Nothing in this subsection may be construed to limit or restrict the authority of the Director of the Bureau of Prisons under section 3621."  18 U.S.C. § 3624(c)(4).  The referenced statute, 18 U.S.C. § 3621, grants authority to the BOP to designate the place of the prisoner's imprisonment that the Bureau determines to be appropriate and suitable considering a broad range of criteria including, for example, the history and characteristics of the prisoner.  18 U.S.C. § 3621(b).

The FMCR staff, including the unit manager who made the initial recommendation, have testified that their recommendation for 60-90 days of RRC placement for Plaintiff was based on a review of all the appropriate factors required by the statute.  For example, in 2008, unit manager Dan Cansino recommended 60-90 days of RRC placement "based on [his] analysis of the resources of the facility available for placement, the nature and circumstances of the plaintiff's crimes, his history and characteristics, his resources as well as consideration of pertinent policy statements by the Sentencing Commission and statements from the judge that imposed the sentence."  (Doc. No. 130, Attach. 18, Decl. of Dan Cansino, Unit Manager ("Cansino Decl.") ¶ 8.)  In addition, Plaintiff filed several inmate-administrative-remedy requests concerning his RRC placement.  On review of Plaintiff's requests, Warden Terrell concluded that the 60-90-day RRC placement was appropriate and that there was no indication of any retaliation as motive for the decision.  Plaintiff appealed to the Regional Director of the BOP and the National Inmate Appeals Administrator to no avail.  The National Inmate Appeals Administrator specifically noted that there was no evidence of retaliation concerning the RRC-placement decision.  Here, Plaintiff has made no showing that the BOP abused its discretion in making an individualized determination about the adjustment and reentry of Plaintiff into the community.  Therefore, Plaintiff's retaliation claims in this regard fail.

In his Second Amended Complaint, Plaintiff also alleges that there were various other retaliatory acts taken against him by the FMCR Defendants, such

as: (1) interfering with his mail from the Social Security Administration; (2) failing to provide medical records to that agency so that Plaintiff would not receive social-security-disability benefits; (3) destroying his "legal mail" from this Court, including the Order dismissing the Mayo Defendants; (4) locking him in a segregated-housing unit for requesting a mattress for his new bed assignment in June 2007; (5) stealing the gall stones that were removed from his body, which would have shown that gall bladder surgery was not necessary, from his locker; and (6) otherwise engaging in a pattern of harassment against him. The FMCR Defendants, however, have provided detailed responses to all of these charges, and Plaintiff has provided no evidence substantiating these claims or showing that these alleged acts, separately or together, amount to a constitutional violation of the Eighth Amendment or any other constitutional provision. *See Wilson v. Seiter*, 501 U.S. 294 (1991). Therefore, Defendants' motion for summary judgment should be granted as to these claims as well.

## RECOMMENDATION

Based on the foregoing and all of the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.    Defendants' Motion to Dismiss or for Summary Judgment (Doc. No. 130), be **GRANTED**; and

2.    Plaintiff's Second Amended Complaint (Doc. No. 104), be **DISMISSED WITH PREJUDICE**.

Date: November 12, 2009

      _s/ Jeffrey J. Keyes_          
      JEFFREY J. KEYES
      United States Magistrate Judge


Under D.Minn. LR 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **November 27, 2009**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. A party may respond to the objecting party's brief within ten days after service thereof. All briefs filed under this rule shall be limited to 3500 words. A judge shall make a *de novo* determination of those portions of the Report to which objection is made. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.